UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                                                       CORRECTED
                                                                       DECISION AND ORDER
      -v-                                                           08-CR-6210 CJS



JUAN DEJESUS SANTIAGO,

                                Defendant.

_____

## INTRODUCTION

The defendant, Juan DeJesus Santiago, stands accused of five counts in a multi-defendant indictment relating to drug trafficking and money laundering. The defendant has moved to suppress statements he purportedly made to the police on July 25, 2007, and on October 8, 2008.

In regard to the defendant's application, a hearing was held on March 22, 2010. Officers Garth Mitchell ("Mitchell"), Hermino Santos ("Santos"), and Eden Torres ("Torres") all of the Rochester Police Department, testified at the hearing.

The Court, having considered the testimony presented and exhibits received into evidence at the hearing, and having made evaluations regarding credibility, makes the following findings of fact and conclusions of law.

# FINDINGS OF FACT

Mitchell is employed as a police officer with the Rochester Police Department, and has been so employed since 1989. On July 25, 2007, at approximately 9:00 a.m., pursuant to his duties as a police officer with the Rochester Police Department, Mitchell had occasion to respond to 355 Averill Avenue in the City of Rochester for a report of a vehicle parked across the sidewalk, blocking it. When Mitchell responded he was in uniform and driving a marked patrol car. Upon arriving at 355 Averill Street, Mitchell observed a gold colored Chevrolet Impala four-door sedan with a New Jersey dealer plate parked across the sidewalk. At roll call on July 25, 2007, Mitchell had received information concerning a different vehicle at 355 Averill Street that had possibly been involved in a shooting that had occurred the night before.

Mitchell knocked on the door of 355 Averill Street, and the defendant, who, according to Mitchell, identified himself as Juan Santiago DeJesus, exited the residence. Then, while outside of 355 Averill Street, Mitchell spoke with the defendant, and called the East Side Division Office of the Rochester Police Department, at which time he was told to bring the defendant in for questioning. While Mitchell indicated at the hearing that he asked the defendant to accompany him to the East Division Side Office and that the defendant agreed, he initially testified as follows:

> A. I asked Mr. Santiago if he was willing to go to the east division office and we ended up going there.
>
> Q. What was Mr. Santiago's response to that question?
>
> A. **I guess he was willing to go to the east division**

(Hearing Transcript ("H.T."), March 22, 2010, at 62:24-25, 63:2-4 (emphasis added).) Mitchell, who does not speak Spanish, spoke to the defendant only in English. In any event, after being with the defendant for only a few minutes outside of 355 Averill Avenue, Mitchell transported him to the East Side Division Office located at 630 North Clinton Avenue. The defendant was not handcuffed and rode in the front seat. When Mitchell arrived with the defendant at the East Side Division Office, he and the defendant were met by Investigator Paul Walther ("Walther") and Santos near Walther's work area in the division office, and then all went to an interview room, which had a table and chairs. From that point, Mitchell had no further contact with the defendant.

Santos is employed as a police officer with the City of Rochester Police Department, and has been so employed for over thirty years. Santos was born in Puerto Rico and has spoken Spanish since his childhood. He can not only speak and understand Spanish without any difficulty, but can read and write Spanish as well. He resided in Puerto Rico for seven years and attended school there for a couple of years. To this day, he continues to speak Spanish in his home every other day or so.

On July 25, 2007, in connection with his duties as a police officer with the City of Rochester Police Department, Santos had occasion to participate in an interview of the defendant that occurred at the East Side Division Office of the Rochester Police Department. Walther had requested Santos, and he told Santos that the reason he wanted him was because the defendant spoke only Spanish. The interview occurred in an interview room at the division office, which was approximately 10 x 10 feet. Walther was in the interview room with Santos and the defendant. Walther asked questions in English, which Santos translated for the defendant into Spanish. Santos only spoke Spanish to the

3

defendant. The interview with the defendant lasted about thirty to thirty-five minutes, and at no time on July 25, 2007, was the defendant advised of his *Miranda* warnings. During the course of the interview, the defendant never spoke English. In fact, at one point when asked by Santos if he was unable to understand questions in English, the defendant replied in Spanish, "Yes," that he "spoke Spanish and felt more comfortable speaking Spanish." H.T., March 22, 2010, at 93:24-25, 94:2-3.

Torres is employed as a police officer with the City of Rochester Police Department, and has been so employed for approximately twenty-three years. On October 9, 2008, about 11:00 a.m., pursuant to his duties with the Rochester Police Department, he became involved in the execution of a search warrant at 41 Roser Street in the City of Rochester. In connection with his participation in the execution of the warrant, he had occasion to observe the defendant being taken into custody outside of 41 Roser Street as the defendant exited the front of the residence. Subsequently, at about 4:45 to 4:50 p.m., Torres had contact with the defendant in an interview room on the third floor of the Rochester Public Safety Building ("PSB"). Torres was asked to come into the PSB because someone conversant in Spanish was needed to speak to the defendant. More specifically, Special Agent James Schmitz of the U.S. Drug Enforcement Agency ("Schmitz") explained to Torres that he needed his assistance to speak with the defendant, since the defendant did not speak English. In that regard, Spanish was Torres' first language, and he grew up speaking it in his home in Puerto Rico. He attended school in Puerto Rico through fifth grade, at which time his family moved to the United States. While in school in Puerto Rico, Torres learned to read and write Spanish and spoke Spanish exclusively. To this day, he continues to speak the language on a regular basis. Moreover, he not only speaks fluent

4

Spanish, but is able to read and write the language as well.

Torres, accompanied by Schmitz, entered the interview room. The defendant was seated at the table in the interview room with one hand handcuffed to the table. Torres does not recall whether he removed the handcuff. Upon entering, Torres spoke to the defendant only in Spanish. Initially, Torres asked the defendant his name, how he was doing, and if he needed anything. The defendant did not indicate that he needed anything. This initial exchange between Torres and the defendant lasted about two minutes.

Torres then proceeded to advise the defendant of his constitutional rights, using a yellow rights card, provided to him by Schmitz, an exact duplicate of which was received into evidence as Exhibit # 1, to assist him. The rights card which Torres utilized was laminated with the rights on one side being in English and on the other side being in Spanish. Torres explained to the defendant that before he could speak to him or ask him any questions, he had to advise him of his rights, to which the defendant responded in Spanish, "Okay." Torres read the defendant his constitutional rights verbatim in Spanish as they appear on Exhibit # 1, the English translation of which appears on the reverse side of the card. After Torres read the defendant his rights, Torres asked him if he understood his rights that had been read to him, to which the defendant responded in Spanish, "Yes." Torres next asked the defendant if he was willing to speak with him, to which the defendant also responded in Spanish, "Yes." The interview was conducted by question and answer. The defendant responded in Spanish to the questions that Torres asked him, and his responses were coherent. During the interview, Schmitz, who did not speak Spanish, asked a couple of questions through Torres.

At the conclusion of the oral interview, Torres asked the defendant if he would mind if Torres wrote down what the defendant had just told him. The defendant indicated in Spanish that he would not mind, and Torres reduced the interview to writing. After doing so, Torres asked the defendant if he knew how to read Spanish, to which the defendant replied in Spanish that he did. Torres then handed the defendant the written statement he had prepared, and he asked the defendant to read a couple of lines out loud, which he did in Spanish. Torres then directed the defendant to read the statement to himself. After the defendant did so, Torres next asked the defendant if the statement was accurate or if he wanted to make any changes. In response, the defendant stated in Spanish, "No, that's what happened." At that point Torres asked the defendant if he would mind signing the statement, and the defendant indicated in Spanish, no, he would not mind. Torres handed the defendant the statement, which consisted of two pages, and the defendant signed both pages. Torres and Schmitz then signed the statement, received into evidence as Exhibit # 2, as well. In addition to the portion written by Torres, Exhibit # 2 has spaces for the defendant's name, age, and address, and contains preprinted *Miranda* warnings.

At no time, from Torres' initial contact with the defendant in the interview room, up to and including the time that the defendant signed Exhibit # 2, did the defendant ever indicate that he wanted a lawyer or that he did not want to speak to the police. Moreover, neither Torres nor Schmitz, made any promises to the defendant, threatened him in any way, or used any physical force against him to get him to speak to them. Additionally, during the time he was interviewed on October 8, 2008, the defendant did not complain of any illness or medical condition, nor did he appear to Torres to be under the influence of alcohol or drugs. The defendant appeared normal to Torres during the interview and was

very calm and coherent. At no time did the defendant ever indicate to Torres that he had any trouble understanding him. Additionally, while Torres and Schmitz were in the interview with him on October 8, 2008, the defendant never had any requests. More specifically, he never asked to use the bathroom. The entire interview with the defendant, including the taking of the written statement, lasted about forty to forty-five minutes.

## CONCLUSIONS OF LAW

A.   Suppression of Statements of July 25, 2007

An interrogation at a police station may be non-custodial, and *Miranda* therefore is inapplicable, where a suspect voluntarily accompanies police officers to the station. *California v. Beheler*, 463 U.S. 1121 (U.S. 1983) Here, the government argues that the defendant voluntarily accompanied Mitchell to the East Side Division on July 25, 2007 and that the subsequent interview of the defendant with Santos and Walther was non-custodial. However, to defeat the defendant's motion to suppress, the government must prevail on both points by a preponderance of evidence. In that regard, the Court need not address the second point, since, based upon its Finding of Facts, the Court concludes that the government has failed to meet its burden of establishing by a preponderance of evidence that the defendant voluntarily consented to accompany Mitchell.

It is clear from the testimony of Santos and Torres that the defendant spoke only Spanish. Torres was told by Schmitz that the defendant did not speak English. Walther told Santos that the defendant spoke only Spanish. Moreover, the defendant indicated to Santos that he was unable to understand English. Therefore, Mitchell's testimony to the effect that the defendant, to whom he spoke only in English, voluntarily agreed to accompany Mitchell to the East Side Division Office is not entirely credible and certainly

7

not sufficient, in light of the testimony of Torres and Santos, to sustain the government's burden of proof. Consequently, the defendant's application to suppress any statements made by the defendant on July 25, 2007 to Santos and Walther is granted.

B. Government's Motion to Reopen

In its post hearing letter memorandum of law, dated April 30, 2010, the government asks, in essence, that if the Court finds that the government has failed to prove by a preponderance of evidence that the defendant voluntarily accompanied Mitchell to the East Side Division Office on July 25, 2007, it be given the opportunity to reopen the suppression hearing. The government has offered that it would call several more witnesses including Walther, Deputy United States Marshal Abhay Dave, Special Agent John Hayes of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and Schmitz. In support of this application, the government cites to *In re Terrorist Bombings of U.S. Embassies in East Africa,* 552 F.3d 177 (2d Cir. 2008), which in pertinent part states:

> As presaged by our earlier cases, we now hold that, on a motion to reopen a suppression hearing, there is no bright-line rule that necessarily and invariably requires the government to provide a reasonable justification for its failure to offer relevant evidence at an earlier suppression proceeding. **Whether or not the government can justify its delay is simply one factor, among others, that a district court may consider when deciding whether to reopen a suppression hearing**. We agree with the other circuits that have reached this conclusion. A "defendant is entitled to have evidence suppressed only if it was obtained unconstitutionally. If matters appearing later indicate that no constitutional violation occurred, society's interest in admitting all relevant evidence militates strongly in favor of permitting reconsideration." *United States v. Regilio*, 669 F.2d 1169, 1177 (7th Cir.1981). As the Ninth Circuit has recognized, "[a] criminal defendant acquires no personal right of redress in suppressed evidence" because the rationale for suppressing unlawfully obtained evidence is to deter official misconduct, not to compensate criminal defendants for the violation. United States v. Rabb, 752 F.2d 1320, 1323 (9th Cir.1984). If the government possesses evidence showing that, in fact, no official misconduct occurred,

> the interests of justice militate strongly in favor of considering this evidence even if it is belatedly brought to the district court's attention. In the last analysis, a district court should be permitted, in the exercise of its discretion and in light of the totality of the circumstances, to determine whether its suppression ruling should stand. While it may often be useful for the government to explain its reasons for not introducing evidence earlier, a district court may consider the evidence without first finding good cause for the government's omission or delay.
>
> The case now before us illustrates the wisdom of consigning the decision to reopen evidentiary hearings to the sound discretion of the district court, unencumbered by bright-line rules. Here, the District Court recognized that its decision to grant Al-Owhali's suppression motion was based on "certain factual assumptions which [subsequently] appear[ed] to be inaccurate" in light of the evidence submitted in support of the government's motion to reopen the suppression hearing. Supplemental App. 1119. In addition, the legal question-namely, the application of the Fifth Amendment and *Miranda* to statements taken overseas-was one "of first impression not only in this circuit but nationally." *Id*. That the District Court chose to reopen the record in light of the government's additional evidence and the significance of the legal question at issue strikes us as an eminently reasonable course of action. In addition, the courts that have imposed a rule requiring the government to show good cause to reopen evidentiary hearings appear to have done so because "from the beginning [of the proceedings] the government was fully aware of what it had to establish to successfully oppose [the defendant's] suppression motion." *Kithcart*, 218 F.3d at 220. **The suppression motion before the District Court in the instant case-involving the applicability of the Fifth Amendment and *Miranda* to overseas investigations-was, as noted, "of first impression" and, accordingly, the government cannot be said to have been aware "from the beginning ... of what it had to establish."**

*Id.* at 196 -97 (emphasis added, footnote omitted). Here the government did not make its motion to reopen until thirty-nine days after the completion of the suppression hearing. Whether the defendant can understand English is certainly not an issue of "first impression" as was the applicability of the First Amendment and *Miranda* to overseas investigations in *In re Terrorist Bombings*.

9

Moreover, the government's explanation on page three of its April 30, 2010, letter memorandum, that it "did not anticipate and was not aware that the defendant's ability to understand English would be an issue prior to the conclusion of the suppression hearing in this matter", is inconsistent with the fact that at all four of his court appearances prior to the suppression hearing (as well as at the suppression hearing), the defendant required the services an interpreter. Therefore, the Court, in an exercise of its discretion, denies the application to reopen.

C.     Suppression of Statements of October 8, 2008

It is  well settled that the government may not use any statements obtained from a defendant, whether exculpatory or inculpatory, which were the product of custodial interrogation, unless prior to any questioning the defendant was advised of his constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Colorado v.  Spring*, 479 U.S. 564 (1987); *Edwards v. Arizona*, 451 U.S. 477 (1981).  That is, the government bears the burden of proving by a preponderance of the evidence both that a defendant was advised of his constitutional rights guaranteed under *Miranda* and that he knowingly, intelligently and voluntarily waived his rights. *Lego v.  Twomey*, 404 U.S. 477, 482-89 (1972). To establish a valid waiver, the government must prove that the relinquishment of rights on a defendant's part was voluntary, and additionally that the defendant had a full awareness of the right being waived and of the consequences of waiving that right. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).

Moreover, it is well settled that the statements of a defendant himself must be voluntary based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). In that regard, the burden is on the government to prove that a confession is voluntary by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne. *Hayes v. State of Washington*, 373 U.S. 503, 513-14 (1963). In other words, a confession is "involuntary" if it is obtained by "'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 515 (1963)). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988). The totality of the surrounding circumstances are evaluated "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987)). "The factors to be considered include 'the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation.'" *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) (quoting *United States v. Mast*, 735 F.2d 745, 749 (2d Cir.1984)).

A language barrier is certainly a factor to consider when determining the validity of a waiver. *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985), *cert. denied*, 474 U.S. 836 (1985)) ("One precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner.") However, the determination is not difficult when the suspect is advised of his rights in a language that he understands. *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987).

Based upon the above-stated principles of law and its findings of fact, the Court concludes that statements, both oral and written made by the defendant to Torres and Schmitz to are admissible. More specifically, the Court finds that the government has established by a preponderance of evidence that prior to any questioning, the defendant was advised of his constitutional rights as guaranteed by the *Miranda* decision and knowingly, intelligently, and voluntarily waived his rights and agreed to speak to Torres and Schmitz.

First, in reaching its determination as to the defendant's *Miranda* warnings, the Court relies on several facts as detailed above. Torres spoke only Spanish to the defendant. Upon entering the interview room with Schmitz, Torres asked the defendant if he needed anything, and the defendant did not have any requests. More specifically, the defendant did not indicate that he needed to use the bathroom. Torres explained to the defendant that before he could speak to him or ask him any questions, he had to advise the defendant his rights, to which the defendant responded in Spanish, "Okay." Torres read the defendant verbatim in Spanish his constitutional rights as they appear on Exhibit # 1,

the English translation of which appears on the reverse side of the card. After reading the defendant his rights, Torres asked him if he understood his rights that had been read to him, to which the defendant responded in Spanish, "Yes." Torres then asked the defendant if he was willing to speak with him, to which the defendant also responded in Spanish, "Yes."

The defendant did not complain to Torres of any illness or medical condition, nor did he appear to Torres to be under the influence of alcohol or drugs. Rather, the defendant appeared normal to Torres. At no time during the interview did the defendant ever indicate that he wanted an attorney, nor did he ever indicate that he did not want to speak with the police.

Second, as to its determination on voluntariness, the Court again relies on its findings of fact. Upon entering the interview room with Schmitz, Torres asked the defendant if he needed anything, and the defendant did not have any requests. More specifically, the defendant did not indicate that he needed to use the bathroom. In fact, at no time during the interview did the defendant have any requests generally or specifically a request to use the bathroom. The interview itself was brief and lasted only about forty-five minutes from 4:45 p.m. to approximately 5:30 p.m. on July 25, 2007. Prior to the interview, the defendant was advised of his *Miranda* warnings in Spanish, and indicated both that he understood them and that he was willing to give them up and speak to the police. During the course of the interview, the defendant responded to the questions in Spanish that Torres asked him, and his responses were coherent. The defendant appeared normal to Torres and was very calm and coherent. At no time during the interview did Torres or Schmitz ever threaten the defendant or use any physical force

against him to get him to speak with them. Additionally, neither Torres nor Schmitz made the defendant any promises to get him to talk. At no time did the defendant ever indicate to Torres that he had any trouble understanding him. Moreover, the defendant never indicated that he wanted a lawyer, nor did he ever indicate that he did not want to talk with the police.

Further, the defendant, did not appear to Torres to be under the influence of alcohol or drugs, nor did the defendant complain of any illness or medical condition. Therefore, the preponderance of evidence establishes that the statements made to Torres and Schmitz. were not the result of any physical or psychological coercion, or by the exertion of any type of improper influence, but, rather, were voluntarily made.

## CONCLUSION

Accordingly, the defendant's application (Docket # 58) to suppress statements is denied in part and granted in part.

IT IS SO ORDERED.

DATED:   May 24, 2010
         Rochester, New York     ENTER.


                                 /s/ Charles J. Siragusa
                                 CHARLES J. SIRAGUSA
                                 United States District Court Judge